914 So.2d 883 (2004)
Michael Wayne EGGERS
v.
STATE of Alabama.
CR-02-0170.
Court of Criminal Appeals of Alabama.
November 24, 2004.
Certiorari Quashed May 20, 2005.
*888 John G. Stokesberry, Jacksonville, for appellant.
William H. Pryor, Jr., and Troy King, attys. gen., and Jeremy W. McIntire, asst. atty. gen., for appellee.
Alabama Supreme Court 1040344.

On Application for Rehearing
SHAW, Judge.
The opinion issued on October 1, 2004, is withdrawn and the following opinion substituted therefor.
The appellant, Michael Wayne Eggers, was convicted of two counts of capital murder in connection with the murder of Bennie Francis Murray. The murder was made capital (1) because it was committed during the course of a kidnapping, see  13A-5-40(a)(1), Ala.Code 1975, and (2) because it was committed during the course of a robbery, see  13A-5-40(a)(2), Ala.Code 1975. By a vote of 11-1, the jury recommended that Eggers be sentenced to death for his convictions. The trial court accepted the jury's recommendation and sentenced Eggers to death.
The evidence adduced at trial indicated the following. Bennie Francis Murray ("Francis") and her husband, Frank, owned and operated a concession business that traveled around the southeast with a carnival. Francis hired Eggers to work concessions; he traveled with the carnival until September 2000, when the carnival arrived in Jasper, where Eggers met a woman. When the carnival left Jasper, Eggers stayed behind and found a job, but apparently lost the job at some point and was unable to find another one. On December 26, 2000, Eggers telephoned Francis, who, along with her husband, lived in Talladega when they were not traveling with the carnival, and asked for a job. Francis explained that the carnival would not begin traveling again until mid-March and that the Murrays' "bunkhouse," a trailer that had been converted into rooms for their employees, would not be available until mid-February. (R. 416.) On December 28, 2000, Eggers telephoned Francis again. He told Francis that he and his 15-year-old son were at the bus station in Birmingham, and asked Francis to come pick them up. Francis picked up Eggers and his son and brought them back to Talladega, where she tried to help Eggers find a temporary job, but was unable to do so. On December 30, 2000, Eggers asked Francis to take him and his son back to Jasper; she agreed.
According to Eggers's statements to police, on their way to Jasper, Eggers asked Francis to take him to his car, which was *889 outside Jasper; he had driven it off the road in inclement weather the week before Christmas and had gotten stuck in a ditch. Francis agreed and, after dropping off Eggers's son at Eggers's apartment in Jasper, Francis and Eggers left in search of Eggers's car. After driving for some time in a rural area of Walker County, Francis stopped her pickup truck on the side of the road and indicated that she was unwilling to go any further and was going to turn around. Eggers then asked her if she was "joining everyone else on the fuck Mike bandwagon." (C. 404.) At that point, Eggers said, Francis "backhanded" him and he "let go ... [and] just started hitting her." (C. 404.) Eggers beat Francis with his fists until she was unconscious, at which point he pushed her as far against the driver's side door of the pickup truck as he could, and drove down a nearby dirt road. When Francis started to regain consciousness ÔÇö "[s]he was making noises and stuff like that" (C. 406) ÔÇö Eggers stopped the truck and pushed her out of the cab of the truck onto the road. Eggers got out of the truck and started cursing at Francis and kicked her several times in the head with the steel-toed boots he was wearing. Eggers then got back in the truck, drove toward the end of the road and turned around, but decided to stop where he had left Francis because he wanted to make sure she was dead and "wasn't going to stay out there suffering." (C. 406.) When Eggers stopped, Francis was starting to regain consciousness so he kicked her again and choked her with his hands "to make sure she was dead." (R. 406.) Eggers again said that he "didn't want to leave her out there suffering." (C. 406.) Eggers then dragged Francis into nearby woods where she could not be seen from the road and, because he believed she was still alive at that point, he put a tree limb on her throat and stood on it in an effort to kill her. Eggers then took Francis's truck to a car wash and washed Francis's blood out of the cab of the truck.[1] He also went through Francis's purse, which was in the truck, and found cash and a debit card. Eggers said that the killing was not premeditated, but was spontaneous.
Following the murder, Eggers picked up his son in Francis's pickup truck and the two drove to Campbellsville, Kentucky, where Eggers's son stayed with a friend. While in Campbellsville, Eggers met a man named Scott Mason, and the two went to the Caesar's Riverboat Casino, docked at New Albany, Indiana, on January 1, 2001. According to Mason, Eggers insisted that they take the red Nissan pickup truck Mason was driving, and they used Francis's debit card to obtain $300 for use at the casino.[2] On their way back to Campbellsville, while they were driving through Bardstown, Kentucky, the police stopped them. After determining that the red Nissan was stolen, the police searched the vehicle and found marijuana in the ashtray. Both Mason and Eggers were arrested. Francis's debit card was found under the passenger seat of the truck a *890 few days later. Eggers posted bond the next day and took a cab back to Campbellsville, where he stayed for a couple of days. Eggers left Campbellsville on January 4, 2001, drove to Bowling Green, Kentucky, where he left Francis's truck at a truck stop near the interstate, and then hitchhiked to Kissimmee, Florida, where he was eventually arrested and admitted to law enforcement that he had murdered Francis.
Following his arrest in Florida, Eggers waived extradition; he was brought back to Alabama and took law-enforcement officers to the area where he had left Francis's body. Francis was found in the woods with a tree limb, approximately four feet long and two inches in diameter, over her neck. Dr. Stephen Pustilnik, who in 2001 was a medical examiner for the State of Alabama and who performed the autopsy on Francis, testified that Francis died from multiple blunt-force trauma and strangulation. Dr. Pustilnik stated that Francis had been "beaten very severely" (R. 778); that she had multiple facial fractures and a "tremendous amount" of swelling of her face (R. 778); that she had trauma to both sides of her head; and that she had hemorrhaging in her scalp and in her brain. Dr. Pustilnik also testified that Francis's hyoid bone, thyroid bone, and two laryngeal bones in her neck were fractured and had a small amount of hemorrhaging. Based on the amount of swelling in the face and hemorrhaging in the head, Dr. Pustilnik concluded that the blows to the face and head occurred first during the attack and that the injuries to the neck, which had little hemorrhaging, occurred toward the end of the attack. Dr. Pustilnik testified that the injuries to Francis's face would have been very painful but were not fatal, and that Francis lived for at least several minutes, but probably less than 20 minutes, after those injuries were inflicted.
Eggers's defense at trial was that the crime he committed was not capital murder. Although Eggers pleaded not guilty and not guilty by reason of mental disease or defect, and although the jury was charged on the defense of insanity, Eggers never claimed, or presented evidence indicating, that he did not kill Francis or that he was insane at the time of the crime. Rather, Eggers claimed that he suffered from intermittent explosive disorder and personality disorder, that the initial attack on Francis in the truck was the result of blind rage precipitated by Francis slapping him, and that, therefore, the kidnapping and robbery were mere afterthoughts unrelated to Francis's murder.
On appeal, Eggers raises several issues, many of which he did not raise by objection in the trial court. Because Eggers was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).
Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
"Plain error" has been defined as error "`so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" Ex parte Womack, 435 So.2d 766, 769 (Ala. *891 1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981). "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's `substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000). This Court has recognized that the "`plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Crim. App.1993), aff'd, 651 So.2d 659 (Ala.1994), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

I.
Eggers contends that the trial court erred in denying his motion to suppress the three statements he gave to law-enforcement personnel after his arrest.

A.
Eggers first contends that his arrest was illegal and that, therefore, all of the statements he made after the arrest were tainted and inadmissible. He maintains that his arrest was illegal because law enforcement "had no search warrant to enter and search the tent." (Eggers's brief at p. 26.) Eggers did not challenge the legality of his arrest in the trial court; therefore, we review this claim under the plain-error rule. See Rule 45A, Ala. R.App.P.
The record reflects that on January 5, 2001, a federal warrant was issued for Eggers's arrest for unlawful flight to avoid prosecution, based on the theft of Francis's truck.[3] The Federal Bureau of Investigation ("the FBI") began trying to locate Eggers, and during its investigation, discovered that telephone calls had been made to one of Eggers's relatives from a public telephone booth in Kissimmee, Florida; the FBI determined that the telephone booth was near an RV park that was the last known residence of Eggers's father. On January 9, 2001, Gabriel Maldonado, a special agent with the FBI, as well as several other law-enforcement officers from the FBI and the Osceola County, Florida, Sheriff's Department, went to the RV park in the hopes of finding Eggers at his father's residence. Agent Maldonado said that he spoke with the resident manager of the park and that the manager said that Eggers's father did not live there anymore. However, near the RV park, across the street from the telephone booth from which the calls had been made, Agent Maldonado noticed what he termed a "tent city ... an area where homeless and transients resided that kind of shaped up at labor pools." (R. 455.) There were several tents and Agent Maldonado decided to interview everyone in the tent city in an attempt to locate Eggers.
Upon arriving at the first tent, Agent Maldonado said, he asked the two occupants of the tent to come out. A man who identified himself as Russell was the first to emerge from the tent; Russell told Agent Maldonado that he was the owner of the tent and that there was another person in the tent. Agent Maldonado testified that he then asked the second individual to come out of the tent and that that individual, later identified as Eggers, did so. In *892 contrast to Agent Maldonado's testimony, Eggers testified at the suppression hearing that he was asleep in the tent when he was awakened by law-enforcement officers, one of whom was shining a flashlight in his face and pointing a gun to his head. Eggers said that he was ordered out of the tent, "thrown up against a fence," handcuffed, and searched. (R. 343.)
Agent Maldonado testified that Eggers initially identified himself as Clay, but that based on the description of Eggers they had received, he and the other law-enforcement officers believed that "Clay" was, in fact, Eggers, and Eggers subsequently admitted who he was and told the officers that his wallet, with all of his identification, was in the tent. Eggers denied that he identified himself as Clay. The law-enforcement officers got Eggers's wallet out of the tent, which contained Eggers's driver's license and his Social Security card, and then arrested Eggers on the fugitive warrant. A duffle bag containing Eggers's personal belongings was subsequently obtained from the back of Russell's pickup truck, and Eggers and his belongings were transported to the Osceola County Sheriff's Department by a sheriff's deputy.
Because Eggers did not challenge the legality of his arrest in the trial court, the details regarding the arrest are, as can be seen from the facts provided above, sketchy. It is clear from the record that the tent in which Eggers was found belonged to Russell, not Eggers, and that the tent was near an RV park. However, nothing in the record indicates that the tent was legally on the property where it was found so that the occupants would have a legitimate expectation of privacy in the tent under the Fourth Amendment to the United States Constitution,[4] and Eggers makes no specific argument in his brief regarding this matter.[5] In addition, it is not clear from the record whether the law-enforcement officers forcefully entered the tent without consent or whether they "knocked on the door" and requested to speak with the occupants and then received Russell's consent to enter the tent.
"`"`This court cannot predicate error on matters not shown by the record, nor can we presume error from a silent record.' Smelcher v. State, 520 So.2d 229 (Ala.Crim.App.1987); Abbott v. State, 494 So.2d 789 (Ala.Crim. App.1986). `Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done.' Jolly v. State, 405 So.2d 76 (Ala.Crim. App.1981); Watson v. State, 398 So.2d 320 (Ala.Crim.App.1980), writ denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981)."'
"Gaddy v. State, 698 So.2d 1100, 1130 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997), quoting Owens v. State, 597 So.2d 734, 736 (Ala.Crim.App.1992). See also Gamble v. State, 791 So.2d 409 (Ala. Crim.App.2000); and Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001). `We will not hold a trial court in error based on the bare, unsupported speculations *893 asserted in an appellant's brief.' Pressley[ v. State, 770 So.2d 115,] 123 [(Ala. Crim.App.1999), aff'd, 770 So.2d 143 (Ala.2000)]."
Johnson v. State, 823 So.2d 1, 22 (Ala. Crim.App.2001). As this Court noted in Gavin v. State, 891 So.2d 907 (Ala.Crim. App.2003):
"`The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred.' Ex parte Watkins, 509 So.2d 1074, 1077 (Ala.1987). `Without any evidence in the record on appeal to support the allegation of error, this court cannot consider the alleged error even under the "plain error" doctrine.' Kuenzel v. State, 577 So.2d 474, 482 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).
"`"Even though ... this Court [is] required to search the record for plain error in every case in which the death sentence has been imposed and to take the appropriate action when such error is found, ... this Court will [not] presume that reversible error occurred at trial when there is nothing in the record to so indicate,...."'
"Id., quoting Ex parte Godbolt, 546 So.2d 991, 998 (Ala.1987)."
891 So.2d at 987.[6]
Nevertheless, assuming that the tent was legally on the property where it was found and, thus, that the occupants could have a legitimate expectation of privacy in the tent under the Fourth Amendment, and that Russell did not consent to the officers' entry into the tent, we still conclude that Eggers's arrest was legal.
Although Eggers concedes that the tent belonged to Russell and that he was only a guest in the tent, he nevertheless argues that he had a legitimate expectation of privacy in the tent. The State argues, on the other hand, that Eggers has no standing to challenge the entry of law-enforcement officers into the tent and, thus, the legality of his arrest because, it says, as a mere guest in the tent belonging to Russell, Eggers had no expectation of privacy in the tent. Based on the record before us, however scant it is, we must reject the State's argument. The record suggests that Eggers was living in the tent with Russell temporarily and, thus, was, at least, an overnight guest. In Minnesota v. Olson, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the United States Supreme Court held that an overnight guest has a legitimate expectation of privacy in his host's home. The Court reasoned:
"To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a house guests has a legitimate expectation of privacy in his host's home.

*894 "From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend. Society expects at least as much privacy in these places as in a telephone booth ÔÇö `a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable,' Katz [v. United States], 389 U.S. [347,] 361 [(1967)] (Harlan, J., concurring).
"That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest. It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises. The host may admit or exclude from the house as he prefers, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objection of the guest. On the other hand, few houseguests will invite others to visit them while they are guests without consulting their hosts; but the latter, who have the authority to exclude despite the wishes of the guest, will often be accommodating. The point is that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household. If the untrammeled power to admit and exclude were essential to Fourth Amendment protection, an adult daughter temporarily living in the home of her parents would have no legitimate expectation of privacy because her right to admit or exclude would be subject to her parents' veto."
495 U.S. at 98-100, 110 S.Ct. 1684. Thus, assuming that the tent was legally on the property where it was found, we agree with Eggers that, as an overnight guest, he had a legitimate expectation of privacy in the tent.
In his brief on appeal, Eggers concedes that the law-enforcement officers who arrested him had a valid arrest warrant; he argues, however, that those officers also needed a valid search warrant before they could enter the tent to effectuate his arrest. We disagree.
In Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the United States Supreme Court held that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." 445 U.S. at 603, 100 S.Ct. 1371. In Steagald v. United States, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), the United States Supreme Court held that in order to enter the home of a third party to search for and execute an arrest warrant upon a suspect believed to be present in the home the police must also have a search warrant for the third party's home if they wanted to use evidence discovered during the search against the third-party homeowner. The *895 Court noted that although the arrest warrant protected the rights of the person named in the warrant, it was not sufficient to protect the rights of the third-party homeowner.
Although Payton and Steagald form the framework for our analysis of the issue presented, we conclude that Payton, not Steagald, ultimately controls. To hold otherwise would afford Eggers more protection while in a third party's home than while in his own. As the Sixth Circuit Court of Appeals explained in United States v. Buckner, 717 F.2d 297 (6th Cir. 1983), when addressing an identical issue:
"The case now before us is not directly on point with either Payton or Steagald. The Payton rule does not directly apply because the defendant was not arrested in his own home. Steagald is also not on point because the person prosecuted in this case was the person named in the arrest warrant.
"....
"In cases such as this one where the defendant is arrested in the home of a third party and is challenging the search of that home, the courts should first focus on the issue of standing. In the usual case, the defendant will not have had a legitimate expectation of privacy in the premises which were searched and therefore will be unable to challenge the search. United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The fact that the entry may have violated the constitutional rights of the third party homeowner would have no effect on the defendant's criminal conviction. United States v. Payner, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). The third party homeowner may, of course, pursue a civil action alleging that the entry into his home without a search warrant violated his civil rights. Dunn v. State of Tennessee, 697 F.2d 121 (6th Cir.1982), cert. denied, [460] U.S. [1086], 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983).
"We find nothing in this record to indicate that the defendant had a legitimate expectation of privacy in his mother's apartment. The defendant did not live there and there are no facts other than his relationship to the occupant of the apartment which would show that he had standing to challenge the search of his mother's apartment. For that reason, we affirm the district court's denial of the defendant's suppression motion.
"....
"Even if the defendant did have standing to challenge the search, the suppression motion was correctly denied because the police had a warrant for his arrest and reason to believe that he was in his mother's apartment. Payton, supra; United States v. Clifford, 664 F.2d 1090 (8th Cir.1981).
"The fact that the defendant was the person named on the arrest warrant mandates application of Payton rather than Steagald. Any other interpretation of the two Supreme Court decisions would either disregard one of the opinions or lead to incongruous results.
"Under Payton, the police could have entered the defendant's own home if they had a warrant for his arrest and reason to believe that he was inside. It would be illogical to afford the defendant any greater protection in the home of a third party than he was entitled to in his own home."
717 F.2d at 299-300. See also United States v. Kaylor, 877 F.2d 658, 663 (8th Cir.1989) ("Kaylor cannot claim any greater Fourth Amendment protection in the... home [of a third party] than he possessed in his own home"; thus, "possession of a warrant for Kaylor's arrest and the *896 officers' reasonable belief of his presence in the ... home [of a third party] justified the entry without a search warrant"); United States v. Underwood, 717 F.2d 482, 484 (9th Cir.1983) ("A person has no greater right of privacy in another's home than in his own. If an arrest warrant and reason to believe the person named in the warrant is present are sufficient to protect that person's fourth amendment privacy rights in his own home, they necessarily suffice to protect his privacy rights in the home of another."); Benavidez v. State, 352 Ark. 374, 379, 101 S.W.3d 242, 246 (2003) (holding that law-enforcement officers did not need a search warrant to enter third-party's apartment where the defendant was living to execute an arrest warrant for the defendant); State v. Shaw, 113 S.W.3d 335, 338 (Tenn.Crim.App.2002) (assuming defendant had expectation of privacy in home of third party in which he was arrested, he "was only entitled to the protection given him under Payton that requires law enforcement to obtain a warrant for his arrest and have reason to believe he is inside the premises"); State v. Williams, 142 Wash.2d 17, 24, 11 P.3d 714, 718 (2000) ("We find no reason to confer additional privacy protections to suspects who are arrested in other person's homes."); State v. Tolbert, 116 Ohio App.3d 86, 686 N.E.2d 1375 (1996) (holding that search warrant was not necessary for police to enter third party's home to arrest defendant pursuant to an arrest warrant because defendant was not entitled to greater Fourth Amendment protections while in a third party's home than he was while in his own home); People v. Hernandez, 218 A.D.2d 167, 173, 639 N.Y.S.2d 423, 426 (1996) (to apply the holding in Steagald to a defendant's arrest in the home of a third party "would create the absurd situation in which a suspect ... has greater rights in someone else's home than in his or her own home"); State v. O'Dell, 576 A.2d 425, 428 (R.I.1990) (because defendant had been living in the house owned by his mother, "the arrest warrant alone was sufficient to justify the entry by the police into the house" under Payton); and Commonwealth v. Stanley, 498 Pa. 326, 334, 446 A.2d 583, 587 (1982) ("If an arrest warrant and `reason to believe' that a suspect can be found on the premises are sufficient for police to invade a suspect's own home, then these facts are sufficient to invade a third party's premises, where a suspect's expectation of privacy is necessarily less.").
As noted above, Agent Maldonado had a valid warrant for Eggers's arrest. In addition, although not argued by Eggers in his brief, we note that Agent Maldonado had reason to believe that Eggers was in one of the tents in the tent city. The last known address of Eggers's father was the RV park near the tent city; telephone calls had been placed to one of Eggers's relatives from the public telephone booth just across the street from the tent city; and, upon arriving in the area, law-enforcement officers determined that Eggers's father was no longer living in the RV park. Based on these facts, it was reasonable for law-enforcement officers to believe that Eggers was in the tent city. Because law-enforcement officers had a valid warrant for Eggers's arrest and reason to believe that he was in the tent city, no search warrant was necessary; their entry into the tent was lawful and, thus, Eggers's arrest was lawful. We find no error, plain or otherwise, as to this claim.

B.
Eggers also contends that his statements were inadmissible because, he says, they were involuntary.
As noted above, Agent Maldonado testified that when Eggers first came out of the tent, he initially identified himself as *897 Clay, but that based on the description of Eggers they had received, he and the other law-enforcement officers believed that "Clay" was, in fact, Eggers, and Eggers subsequently admitted who he was and told the officers that his wallet, with all of his identification, was in the tent. Eggers was then arrested and transported to the Osceola County Sheriff's Department by a sheriff's deputy. Agent Maldonado testified that he could not remember which deputy transported Eggers to the sheriff's department and no one from the Osceola County Sheriff's Department testified at the suppression hearing or at trial; however, Agent Maldonado testified at the suppression hearing that he was never informed that Eggers had made any kind of statement while being transported to the Sheriff's Department, but that Eggers had been transported "from the tent city to the Sheriff's Office with no statement." (R. 326.)
Once at the sheriff's department, Agent Maldonado said, he advised Eggers of his Miranda rights,[7] Eggers indicated that he wanted to make a statement, and Eggers then signed a waiver-of-rights form. Agent Maldonado testified that he then advised Eggers that he was being arrested on a warrant for unlawful flight to avoid prosecution and that Eggers "asked me if I wanted to know where the body was." (R. 457.) Eggers then orally confessed to murdering Francis, provided details about the murder, and agreed to take law-enforcement officers to the location of Francis's body. While Agent Maldonado was writing his notes about Eggers's oral confession, he asked Eggers if he would be willing to make a written statement and Eggers agreed. Eggers then handwrote a short statement, again admitting to murdering Francis. The following morning, January 10, 2001, Eggers was brought before a Florida circuit judge and waived extradition.
Agent Maldonado testified that, although he and the other law-enforcement officers had their guns drawn when they entered the tent city, they did not put their guns to Eggers's head or otherwise threaten Eggers when they arrested him. Agent Maldonado also testified that Eggers never asked for a lawyer at any time in his presence; that he never promised Eggers any reward for making a statement; that he never threatened Eggers to get him to make a statement; and that he did not tell Eggers that it would be better for him if he made a statement or worse for him if he did not make a statement. Agent Maldonado specifically denied threatening to get Eggers's son, girlfriend, or father involved in the situation if Eggers did not make a statement.
In contrast, Eggers testified at the suppression hearing that when he was discovered in the tent city and initially asked what his name was, he did not give a false name, but asked for a lawyer. Eggers said that the officers ignored his request for a lawyer and asked him what his name was again, and that he then identified himself and told the officers that his identification was in his wallet in the tent. While being transported to the Osceola County Sheriff's Department, Eggers said, he again requested a lawyer, and was told by the deputy that he "would have to take that up as soon as we got to the Sheriff's Office." (R. 347.) Eggers testified that when he arrived at the sheriff's department, Agent Maldonado did not advise him of his Miranda rights, but threatened him. According to Eggers, Agent Maldonado told him that he "had to answer some questions" and then said that if he did not answer the questions, he (Agent Maldonado) *898 would get Eggers's girlfriend, father, and son involved. (R. 350.) Eggers said that it was only after Agent Maldonado threatened to involve his father and his son that he agreed to make a statement, and that only after he agreed to make a statement did Agent Maldonado advise him of his Miranda rights and did he sign the waiver-of-rights form. Eggers also testified that he waived extradition because he "had no choice," the "FBI was taking [my rights] away from me." (R. 354.)
After Eggers waived extradition, Joe Brzezinski, an investigator with the Alabama Bureau of Investigation, as well as other Alabama law-enforcement officers, flew to Kissimmee and transported Eggers back to Alabama. Upon arrival at the Walker County Airport in Jasper, Eggers took law-enforcement officers to the location of Francis's body. Inv. Brzezinski testified that when they got into the vehicles, he advised Eggers of his Miranda rights and asked Eggers if he was willing to continue cooperating, to which Eggers replied "that's what we're here for." (R. 293.) Eggers then led law-enforcement officers to the location of Francis's body, during which time he again admitted to murdering Francis and explained the events surrounding the murder. Inv. Brzezinski stated that Eggers was not coerced or threatened; that Eggers was not promised anything for his cooperation; and that Eggers was never told that it would be better for him if he cooperated. After Francis's body was located, Eggers was taken to the Walker County jail.
The following day, on January 11, 2001, Inv. Brzezinski went to the Walker County jail and spoke with Eggers again. Inv. Brzezinski testified that, before speaking with Eggers, he advised Eggers of his Miranda rights; that Eggers indicated that he understood those rights; and that Eggers signed a waiver-of-rights form. Eggers then gave a third statement, again admitting to the murder of Francis and detailing the circumstances of that murder; that statement was audio taped. Inv. Brzezinski testified that Eggers was not threatened into making the statement; that Eggers was not promised anything for making the statement; and that no one told Eggers that it would be better for him to make the statement.
Eggers admitted at the suppression hearing that Inv. Brzezinski advised him of his Miranda rights before he took Inv. Brzezinski to where Francis's body was located and again before he gave his third statement to Inv. Brzezinski at the Walker County jail the next day, and that he was not threatened or coerced into making either of those statements. Eggers also admitted that he signed a waiver-of-rights form before he gave his third statement at the jail.
The general rule is that a confession or other inculpatory statement is prima facie involuntary and inadmissible and the burden is on the State to prove by a preponderance of the evidence that such a confession or statement is voluntary and admissible. See, e.g., Ex parte Price, 725 So.2d 1063 (Ala.1998). To prove voluntariness, the State must establish that the defendant "made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him." Lewis v. State, 535 So.2d 228, 235 (Ala. Crim.App.1988). If the confession or inculpatory statement is the result of custodial interrogation, the State must also prove that the defendant was properly advised of, and that he voluntarily waived, his Miranda rights. See Ex parte Johnson, 620 So.2d 709 (Ala.1993), and Waldrop *899 v. State, 859 So.2d 1138 (Ala.Crim.App. 2000), aff'd, 859 So.2d 1181 (Ala.2002).
"`The question of whether a confession was voluntary is initially to be determined by the trial court.'" Minor v. State, 914 So.2d 372, 388 (Ala.Crim.App. 2004), quoting Jackson v. State, 562 So.2d 1373, 1381 (Ala.Crim.App.1990). "[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court. Absent a gross abuse of discretion, a trial court's resolution of [such] conflict[s] should not be reversed on appeal." Sheely v. State, 629 So.2d 23, 29 (Ala.Crim.App. 1993) (citations omitted). "[A] trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, ... and is not to be reversed absent a clear abuse of discretion." Jackson v. State, 589 So.2d 781, 784 (Ala.Crim. App.1991). "When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible his decision will not be disturbed on appeal `unless found to be manifestly contrary to the great weight of the evidence.'" Ex parte Matthews, 601 So.2d 52, 53 (Ala.1992), quoting Williams v. State, 456 So.2d 852, 855 (Ala.Crim.App. 1984). "`In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court.'" Kennedy v. State, 640 So.2d 22, 26 (Ala. Crim.App.1993), quoting Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App.1985), aff'd, 494 So.2d 772 (Ala.1986).

1.
Eggers contends that his statements were involuntary because, he says, he requested a lawyer on two occasions before he gave his first statement to Agent Maldonado, and those requests were denied.
In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court held:
"[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... [A]n accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."
451 U.S. at 484-85, 101 S.Ct. 1880 (footnote omitted). The purpose of this rule is to protect an accused in police custody from "`badger[ing]' or `overreaching' ÔÇö explicit or subtle, deliberate or unintentional ÔÇö [that] might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." Smith v. Illinois, 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), quoting Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).
"This `rigid' prophylactic rule, Fare v. Michael C., 442 U.S. 707, 719 (1979), embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel. See, e.g., Edwards v. Arizona, supra, 451 U.S. [477], at 484-485 [(1981)] (whether accused `expressed his desire' for, or `clearly asserted' his right to, the assistance of counsel); Miranda v. Arizona, 384 U.S. [436], at 444-445 [(1966)] *900 (whether accused `indicate[d] in any manner and at any stage of the process that he wish[ed] to consult with an attorney before speaking'). Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked. Edwards v. Arizona, supra, [451 U.S.,] at 485, 486, n. 9."
Smith v. Illinois, 469 U.S. at 95, 105 S.Ct. 490.
At the suppression hearing, Eggers testified that he requested a lawyer immediately upon his arrest in the tent city and again in the patrol car while being transported to the Osceola County Sheriff's Department. Agent Maldonado's testimony directly refuted Eggers's claim that he requested a lawyer immediately upon his arrest; Agent Maldonado specifically testified that Eggers never requested a lawyer when he was arrested at the tent city. Resolving this conflicting evidence in favor of the trial court's ruling, as we must, we conclude that Eggers did not request a lawyer when he was arrested.
Whether Eggers requested a lawyer while in the patrol car being transported to the sheriff's department, however, is a closer question. The State did not call the Osceola County Sheriff's Deputy who transported Eggers to the Sheriff's Department to testify, but during redirect examination of Agent Maldonado at the suppression hearing, the following occurred:
"[Prosecutor]: And [defense counsel] has asked you about requests from other officers for attorneys, at any time during your interrogation, did he ever ask you for an attorney?
"[Agent Maldonado]: No.
"[Prosecutor]: Did he ever mention that he had asked for an attorney or wanted an attorney?
"[Agent Maldonado]: No.
"[Prosecutor]: And did you ask him if he wanted an attorney when you gave him his Miranda rights?
"[Agent Maldonado]: The right to ÔÇö the reading of the Miranda rights and when they transported him, I wasn't told he made a statement. He was transported from the jail to the ÔÇö from the tent city to the Sheriff's Office with no statement."
(R. 325-26.) (Emphasis added.) We think a reasonable inference from the above-quoted portion of Agent Maldonado's testimony is that Agent Maldonado was informed by the deputy who transported Eggers to the sheriff's department that Eggers had not said anything in the patrol car during the transport, i.e., that Eggers did not request a lawyer. Although the trial court did not issue any findings of fact when denying Eggers's motion to suppress and, thus, we do not know the reason for the trial court's ruling, it would not have been an abuse of discretion for the trial court to find, based on the above testimony of Agent Maldonado, that Eggers did not invoke his right to counsel while in the patrol car.
However, assuming that it could not be inferred from the above-quoted portion of Agent Maldonado's testimony that Eggers did not request a lawyer while in the patrol car being transported to the Sheriff's Department and, thus, that Eggers's testimony that he did make such a request in the patrol car is unrefuted, we still conclude that Eggers's subsequent statements were properly admitted into evidence.
*901 Agent Maldonado testified that when they arrived at the sheriff's department, he advised Eggers of his Miranda rights; that Eggers indicated that he wanted to make a statement; and that Eggers's signed a waiver-of-rights form. According to Agent Maldonado, after Eggers's signed the form, he advised Eggers of the reason for his arrest and Eggers then "asked me if I wanted to know where the body was." (R. 457.) In response, Agent Maldonado said, "`Well, if you want to tell me about it.'" (R. 310.) At that point, Eggers gave his first confession. Agent Maldonado said that he was surprised by Eggers's statement regarding a body because he was not aware at that time that there had been a murder; he knew only that there was a fugitive warrant for Eggers's arrest for unlawful flight to avoid prosecution based on the theft of a truck and that there may have been a missing person involved. Although Eggers's version of the events at the sheriff's department was different than Agent Maldonado's, Agent Maldonado's testimony was sufficient to establish that Eggers was not subject to custodial interrogation until after he had initiated further conversation with Agent Maldonado and that he had voluntarily waived his previously invoked right to counsel.
In Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the United States Supreme Court defined the term "interrogation" as "either express questioning or its functional equivalent," i.e., "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 300-01, 100 S.Ct. 1682 (footnotes omitted). In his opinion concurring in the result in Edwards, Justice Powell noted the difference between custodial interrogation and custodial communications:
"Communications between police and a suspect in custody are commonplace. It is useful to contrast the circumstances of this case with typical, and permissible, custodial communications between police and a suspect who has asked for counsel. For example, police do not impermissibly `initiate' renewed interrogation by engaging in routine conversations with suspects about unrelated matters. And police legitimately may inquire whether a suspect has changed his mind about speaking to them without an attorney. E.g., State v. Turner, 32 Or.App. 61, 65, 573 P.2d 326, 327 (1978); see State v. Crisler, 285 N.W.2d 679, 682 (Minn. 1979); State v. Marcum, 24 Wash.App. 441, 445-446, 601 P.2d 975, 978 (1979). It is not unusual for a person in custody who previously has expressed an unwillingness to talk or a desire to have a lawyer, to change his mind and even welcome an opportunity to talk. Nothing in the Constitution erects obstacles that preclude police from ascertaining whether a suspect has reconsidered his original decision. As Justice White has observed, this Court consistently has `rejected any paternalistic rule protecting a defendant from his intelligent and voluntary decisions about his own criminal case.' Michigan v. Mosley, 423 U.S. 96, 109 (1975) (White, J., concurring in result)."
Edwards, 451 U.S. at 490-91, 101 S.Ct. 1880 (Powell, J., concurring in the result) (footnote omitted). Agent Maldonado's advising Eggers of his Miranda rights and of the reason for his arrest did not constitute interrogation or its functional equivalent, but was a routine incident of arrest. At most, Agent Maldonado's actions in advising Eggers of his Miranda rights and obtaining Eggers's waiver of those rights was a proper inquiry as to whether Eggers *902 had changed his mind about wanting a lawyer. "Although interrogation may not continue [after an accused has requested counsel], the police legitimately may inquire whether the suspect has changed his mind about speaking to them without an attorney." McCall v. State, 501 So.2d 496, 500 (Ala.Crim.App.1986). See also Caldwell v. State, 249 Ga.App. 885, 549 S.E.2d 449 (2001) (police officer's informing accused of the charges against him and informing accused that he could change his mind about his previous request for a lawyer and give a statement if he chose to do so did not constitute interrogation).
Moreover, there can be no doubt that by asking Agent Maldonado if he "wanted to know where the body was" Eggers initiated the conversation about the murder. "Initiation" is an inquiry that can "be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." Oregon v. Bradshaw, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality opinion). Eggers's question was not a routine inquiry arising out of the incidents of custody, such as a request for a drink of water; it was a clear question relating directly to the murder, and it showed Eggers's willingness to speak with Agent Maldonado about the crime. See, e.g., Living v. State, 796 So.2d 1121 (Ala.Crim.App.2000) (by making spontaneous and unsolicited statements about the crime after he had requested a lawyer, the accused initiated the conversation with the police); Burgess v. State, 827 So.2d 134 (Ala.Crim.App.1998), aff'd, 827 So.2d 193 (Ala.2000) (by asking police officer what the charge against him was and what punishment he could be facing for that charge, the accused initiated the conversation with the police); Buchannon v. State, 652 So.2d 799, 801 (Ala. Crim.App.1994) (by asking police officer "`[W]hat, what robbery ÔÇö what was constituting the robbery?'" after he had invoked his right to counsel, the accused initiated the conversation); Seawright v. State, 479 So.2d 1362, 1366 (Ala.Crim.App.1985) (by stating "`I want to get it off my chest. I did it. It was self defense'" after he had invoked his right to counsel, the accused initiated the conversation with the police); and Moulds v. State, 429 So.2d 1176, 1179 (Ala.Crim.App.1983) ("The defendant's assertion that she was ready to make a statement, even if made in response to an officer's inquiry of whether she had `changed her mind about speaking to them without an attorney,' constitutes a communication initiated by the accused under Edwards.").
Finally, for the reasons explained in Part I.B.3. of this opinion, we conclude that Eggers's waiver of his previously invoked right to counsel was knowingly and voluntarily made.
Therefore, even assuming that Eggers invoked his right to counsel while in the patrol car on the way to the Sheriff's Department, there was no violation of Edwards because Eggers was not subjected to custodial interrogation, but initiated the conversation about the murder with Agent Maldonado and knowingly and voluntarily waived his previously invoked right to counsel.

2.
Eggers also contends that his first statement to Agent Maldonado was involuntary because, he says, Agent Maldonado threatened and coerced him into giving the statement.
"The test for the voluntariness of an extrajudicial confession or an inculpatory statement is whether, in light of all the surrounding circumstances, the statement was free from inducement, threat, or promise, either expressed or implied, that would have produced in the *903 mind of the accused any fear of harm or hope of favor."
Ex parte Jackson, 836 So.2d 979, 982-83 (Ala.2002). "`When determining the admissibility of a confession, this Court must look at the entire circumstances, not only the behavior of the interrogators in creating pressure, but also the defendant's experience with the criminal justice system and personal characteristics.'" Smith v. State, 795 So.2d 788, 809 (Ala.Crim.App. 2000), quoting Craig v. State, 719 So.2d 274, 278 (Ala.Crim.App.1998).
"It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe [v. Connecticut], 367 U.S. [568,] 602, 81 S.Ct. [1860,] 1879, 6 L.Ed.2d 1037 [(1961),] the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, `if his will has been overborne' by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
"The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the `totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim. App.1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is `whether the defendant's will was overborne at the time he confessed') (emphasis added)....
"....
"... Thus, the test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by `apprehension of harm or hope of favor.' See [Ex parte] Gaddy, 698 So.2d [1150,] 1154 [(Ala.1997)] (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala. 1988)); Culombe, 367 U.S. at 602, 81 S.Ct. at 1879; Jackson, 562 So.2d at 1380. To determine if a defendant's will has been overborne, we must assess `the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; `[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.' Jackson, 562 So.2d at 1380-81 (citations omitted)."
McLeod v. State, 718 So.2d 727, 729-30 (Ala.1998) (footnote omitted).
*904 Although Eggers testified at the suppression hearing that before he gave his first statement to Agent Maldonado at the Osceola County Sheriff's Department, Agent Maldonado threatened to involve his girlfriend, his father, and his son in the investigation, and that only after those threats was he advised of his Miranda rights and did he sign the waiver-of-rights form, Agent Maldonado's version of events was quite different. Agent Maldonado testified that he never threatened to involve Eggers's girlfriend, father, or son in the investigation, nor did he make any other type of threats; that he did not coerce Eggers into making a statement; that he did not promise Eggers anything for making a statement; and that he never indicated that Eggers would be better off if he made a statement or worse off if he did not make a statement. In addition, nothing in the record suggests that the circumstances surrounding the statement were otherwise coercive or threatening; Eggers was not interrogated for a lengthy period of time nor was he deprived of sleep, food, or drink. Moreover, the record indicates that Eggers had some, although not much, experience with the criminal justice system. As noted above, he was arrested in Kentucky only a few days before his arrest for this crime; the record also indicates that he was arrested in California in March 2000, was released, and then fled to Alabama. Under these circumstances, we find no abuse of discretion on the part of the trial court in resolving adversely to Eggers the conflict between Agent Maldonado's testimony and Eggers's testimony and in finding, based on the circumstances surrounding the statement, that Eggers's first statement was voluntary.

3.
Eggers also contends that he did not knowingly and voluntarily waive his Miranda rights before making his three statements.
"Whether a waiver of Miranda rights is voluntarily, knowingly, and intelligently made depends on the facts of each case, considering the totality of the circumstances surrounding the interrogation, including the characteristics of the accused, the conditions of the interrogation, and the conduct of the law-enforcement officials conducting the interrogation."
Foldi v. State, 861 So.2d 414, 421 (Ala. Crim.App.2002). "[A] waiver need not be express but may be inferred from the circumstances." Hodges v. State, 500 So.2d 1273, 1276 (Ala.Crim.App.1986). As the United States Supreme Court explained in North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979):
"An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case. As was unequivocally said in Miranda, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated."
441 U.S. at 373, 99 S.Ct. 1755 (footnote omitted).
"While all extra-judicial confessions are prima facie involuntary and can be *905 rendered admissible only by a showing that `an express and affirmative' waiver was given, there is no set pattern or manner for a waiver. Sullivan v. State, 351 So.2d 659 (Ala.Cr.App.), cert. denied, 351 So.2d 665 (Ala.1977); Lloyd v. State, 45 Ala.App. 178, 227 So.2d 809 (1969). A waiver will not be presumed simply from the silence of the accused after the warnings are given or simply from the fact that a confession or admission was obtained.
"Where, however, the totality of the circumstances indicates that the confession or admission was voluntary, a confession or admission will not be excluded simply because the accused did not state that he understood his rights or did not sign a written waiver. This is the import of North Carolina v. Butler, [441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)]. In Sullivan v. State, [351 So.2d at 664], this court stated:
"`Any clear manifestation of a desire to waive is sufficient. The test is a showing of a knowing intent, not the utterance of a shibboleth. The criterion is not solely the language but a combination of that articulation and the surrounding facts and circumstances. Lloyd, 45 Ala.App. at 184, 227 So.2d at 814.'"
Wright v. State, 489 So.2d 701, 702-03 (Ala.Crim.App.1986). "A trial court's determination that a defendant voluntarily waived his Miranda rights will not be overturned absent an abuse of discretion." Waldrop v. State, 859 So.2d 1138, 1156 (Ala.Crim.App.2000), aff'd, 859 So.2d 1181 (Ala.2002)
With respect to Eggers's first statement on January 9, 2001, Agent Maldonado testified that he advised Eggers of his Miranda rights immediately upon arrival at the sheriff's department, that Eggers indicated that he wanted to make a statement, and that Eggers then signed the waiver-of-rights form. As noted above, Agent Maldonado also testified that he did not threaten or coerce Eggers into making the statement and nothing in the record suggests that the circumstances surrounding the statement were otherwise coercive or threatening.
With respect to Eggers's second statement, given to Inv. Brzezinski on January 10, 2001, while taking law-enforcement officers to the location of Francis's body, Inv. Brzezinski testified that when he and Eggers got in the vehicles to go to the location of Francis's body, he advised Eggers of his Miranda rights and asked Eggers if Eggers was willing to continue cooperating, to which Eggers replied "that's what we're here for." (R. 293.) Although Eggers did not sign a waiver-of-rights form at that time nor did he expressly state that he was willing to waive his rights, as noted above, a waiver need not be express. Eggers had been advised of, and voluntarily waived, his Miranda rights the day before, before his first statement to Agent Maldonado and, in that first statement, had offered to show law-enforcement officers the location of the body; the morning Eggers took law-enforcement officers to the location of Francis's body, Eggers was brought before a Florida circuit judge and had waived extradition; Inv. Brzezinski stated that Eggers was not coerced or threatened, that Eggers was not promised anything for his cooperation, and that Eggers was never told that it would be better for him if he cooperated, and Eggers conceded this at the suppression hearing.
With respect to Eggers's third statement on January 11, 2001, while in the Walker County jail, Inv. Brzezinski testified that he again advised Eggers of his Miranda rights; that Eggers indicated that he understood his rights; and that *906 Eggers then signed a waiver-of-rights form. Inv. Brzezinski also testified that Eggers was not threatened into making the statement, that Eggers was not promised anything for making the statement, and that no one told Eggers that it would be better for him to make the statement; Eggers conceded this at the suppression hearing; and the record does not indicate that the circumstances surrounding the taking of the statement were otherwise threatening or coercive.
In addition, there is no indication in the record that any of the three statements was the result of prolonged interrogations; that Eggers was intoxicated or under the influence of narcotics at the time he made the statements so that he was unable to understand his Miranda rights as they were read to him or the waiver-of-rights forms that he signed before his first and third statements; or that Eggers had any mental illness that would have prevented him from understanding his Miranda rights or the waiver-of-rights forms.
Making all reasonable inferences and credibility choices in favor of the trial court's ruling and considering the totality of the circumstances, we conclude that Eggers voluntarily and knowingly waived his Miranda rights before each of his statements.
Accordingly, the trial court properly denied Eggers's motion to suppress his statements to police.

C.
Finally, Eggers contends that he "did not get a fair hearing on his motion to suppress" because, he says, the trial court did not allow him to make an argument after the testimony had been presented and did not read his memorandum of law in support of his motion to suppress. (Eggers's brief at p. 32.)
The record reflects that the suppression hearing began late in the afternoon on August 20, 2002, after the jury had been struck. The hearing concluded the morning of August 21, 2002, just before opening statements. At the conclusion of the suppression hearing, the following occurred:
"[Eggers's counsel]: Judge, just for the record, we would like to submit a brief in support of this suppression [motion].
"[Prosecutor]: Well, Judge, we're gonna object to that. We were never given a copy of this to make a response and we would object to it being submitted.
"THE COURT: I won't read it until you look through it.
"[Prosecutor]: They had an opportunity yesterday to give it to us, they had it yesterday and they did not do it.
"THE COURT: Well, I'm gonna have to rule on this anyway right now.
"[Prosecutor]: We would ask you to go ahead and rule on it based on what you heard.
"[Eggers's counsel]: Well, Judge, then in that case, we would like to make arguments.
"THE COURT: No, there's no need to do that. I read.
"[Eggers's counsel]: We'd like an exception then, sir.
"THE COURT: Okay.
"[Prosecutor]: I guess the suppression [motion] was denied?
"THE COURT: (Nods in the affirmative) For the record, the motion by the State [sic] is denied."
(R. 380-81.)
We find nothing improper or unfair in the trial court's handling of the suppression hearing. Eggers was allowed to present whatever evidence he wanted to refute the State's evidence establishing *907 the admissibility of his statements. Although the trial court denied Eggers's request to make an argument at the hearing, Eggers does not assert on appeal what specific argument he believes his counsel should have been allowed to present or how such argument would have affected the trial court's ruling. It appears from the court's statements that it denied the request for argument because it planned to read the memorandum of law submitted by Eggers's counsel; nothing in the record suggests that the court did not read the memorandum as it indicated it would. Although the court needed to rule on the motion to suppress at that time ÔÇö the jury was waiting for the trial to begin ÔÇö if upon reading the memorandum of law submitted by Eggers's counsel, the court determined that its earlier ruling was incorrect, it could easily have changed its ruling. We have reviewed the memorandum of law submitted by Eggers's counsel ÔÇö we considered it in making our determination in Part I.B. of this opinion that Eggers's statements were properly admitted into evidence ÔÇö and we have found nothing in it that would have changed the outcome of the suppression hearing. See, e.g., Broadnax v. State, 825 So.2d 134, 169 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001) (no plain error in trial court's not holding suppression hearing to determine admissibility of defendant's statements where the record clearly showed that the statements were properly admitted into evidence). Eggers was not denied a fair suppression hearing; thus, we find no error as to this claim.

II.
Eggers contends the evidence was insufficient to sustain his convictions.
"`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" Ballenger v. State, 720 So.2d 1033, 1034 (Ala. Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). "`The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So.2d 497, 498 (Ala. Crim.App.1997), quoting O'Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). "`When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). "The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978).

A.
Eggers contends that the evidence was insufficient to sustain his conviction for capital murder during a kidnapping because, he says, there was no evidence that he intended to prevent Francis's liberation, an essential element of kidnapping in the first degree.
Section 13A-5-40(a)(1), Ala.Code 1975, provides that "[m]urder by the defendant during a kidnapping in the first degree or an attempt thereof committed by the defendant" is capital murder. Section 13A-6-43, *908 Ala.Code 1975, provides, in pertinent part:
"(a) A person commits the crime of kidnapping in the first degree if he abducts another person with intent to
"(1) Hold him for ransom or reward; or
"(2) Use him as a shield or hostage; or
"(3) Accomplish or aid the commission of any felony or flight therefrom; or
"(4) Inflict physical injury upon him, or to violate or abuse him sexually; or
"(5) Terrorize him or a third person; or
"(6) Interfere with the performance of any governmental or political function."
Eggers was charged with abducting Francis with the intent to terrorize her,  13A-6-43(a)(5), and/or to inflict physical injury upon her,  13A-6-43(a)(4).
Section 13A-6-40(2), Ala.Code 1975, defines abduct as "[t]o restrain a person with intent to prevent his liberation by either... [s]ecreting or holding him in a place where he is not likely to be found, or ... [u]sing or threatening to use deadly physical force." Restrain is defined in  13A-6-40(1), Ala.Code 1975, in pertinent part, as
"To intentionally or knowingly restrict a person's movements unlawfully and without consent, so as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved. Restraint is `without consent' if is accomplished by:
a. Physical force, intimidation or deception...."
To establish kidnapping in the first degree, the State must prove two intents: the intent to prevent the victim's liberation under the abduction element of kidnapping, and one of the six intents in  13A-6-43(a). See, e.g., Owens v. State, 531 So.2d 2, 13 (Ala.Crim.App.1986), remanded on other grounds, 531 So.2d 21 (Ala.1987). "`Intent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.'" Seaton v. State, 645 So.2d 341, 343 (Ala. Crim.App.1994), quoting McCord v. State, 501 So.2d 520, 528-29 (Ala.Crim.App.1986). "`The intent of a defendant at the time of the offense is a jury question.'" C.G. v. State, 841 So.2d 281, 291 (Ala.Crim.App. 2001), aff'd, 841 So.2d 292 (Ala.2002), quoting Downing v. State, 620 So.2d 983, 985 (Ala.Crim.App.1993). "Proof of intent, necessary to convict under  13A-6-43, `must be found by the jury and may be inferred from the facts and circumstances attending the whole transaction.'" Owens, 531 So.2d at 13, quoting Doss v. State, 23 Ala.App. 168, 180, 123 So. 237, 248 (1929).
Viewed in a light most favorable to the State, the evidence from which the jury could have concluded that Eggers intended to prevent Francis's liberation was ample. After beating Francis unconscious, Eggers transported her to a rural and isolated dirt road, where he kicked and strangled her and then dragged her into the woods so that she could not be seen from the road. The jury could have easily inferred from these circumstances that Eggers intended to prevent Francis's liberation by secreting or holding her in a place where she was not likely to be found and by using deadly physical force. As this Court noted in Duncan v. State, 827 So.2d 838 (Ala.Crim.App.1999), aff'd, 827 *909 So.2d 861 (Ala.2001), "[t]he act of transporting the victim to an isolated area clearly supports the conclusion that the appellant and his accomplices intended to prevent her liberation by `[s]ecreting [her] or holding [her] in a place where [she was] not likely to be found.'" 827 So.2d at 843. There was sufficient evidence to establish kidnapping in the first degree and thus to support Eggers's conviction for murder made capital because it was committed during a kidnapping.

B.
Eggers also contends the following:
"The crime of capital robbery/murder is a single offense beginning with the act of robbing or attempting to rob and culminating in the act of intentionally killing the victim; the offense consists of two elements, robbing and intentionally killing. A robbery committed as a `mere afterthought' and unrelated to the murder will not sustain a conviction under this section. No robbery was planned or being carried out. The murder did not begin with a robbery. Francis was taking [Eggers] to get his car out. The smack caused an uncontrollable rage. The so-called robbery had nothing to do with the killing. Francis's property was taken as a mere afterthought when [Eggers] fled the scene in a panic. He only wanted to get away from the scene of the killing. There is absolutely no evidence from which a jury could infer that while they were looking for his car that [Eggers] intended to rob Francis.
"The crime of capital kidnapping/murder is a single offense beginning with the act of kidnapping or attempting to kidnap and culminating in the act of intentionally killing the victim. A kidnapping committed as a `mere afterthought' and unrelated to the murder will not sustain a conviction under this section [ 13A-5-40(a)(1), Ala.Code 1975.] This murder did not begin with a kidnapping. This [murder] was unrelated to a kidnapping and did not occur in the course of a kidnapping."
(Eggers's brief at pp. 23-24) (citations omitted).
Murder committed "during" a kidnapping and "during" a robbery are capital offenses. See  13A-5-40(a)(1) and (a)(2), Ala.Code 1975. "During" is defined as "in the course of or in connection with the commission of, or in immediate flight from the commission of the underlying felony or attempt thereof."  13A-5-39(2), Ala. Code 1975. It is well-settled that "[a]n accompanying felony committed as a `mere afterthought' and unrelated to the murder will not sustain a conviction of capital murder." Padgett v. State, 668 So.2d 78, 83 (Ala.Crim.App.1995). In Freeman v. State, 776 So.2d 160 (Ala.Crim.App.1999), aff'd, 776 So.2d 203 (Ala.2000), this Court explained the concept of "afterthought" in relation to capital murder during a robbery as follows:
"`The capital crime of the intentional killing of the victim during a robbery or an attempted robbery is a single offense beginning with the act of robbing or attempting to rob and culminating with the intentional killing of the victim. The offense consists of two elements, robbing and intentionally killing. Davis v. State, 536 So.2d 110 (Ala.Cr.App.1987), aff'd, 536 So.2d 118 (Ala.1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); Magwood v. State, 494 So.2d 124 (Ala.Cr.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
"`"As the Alabama Supreme Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), `the fact that the victim was dead at the time the *910 property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events.' Clements v. State, 370 So.2d 708, 713 (Ala.Cr.App. 1978), aff'd in pertinent part, 370 So.2d 723 (Ala.1979); Clark v. State, 451 So.2d 368, 372 (Ala.Cr.App.1984). To sustain any other position `would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute.' Thomas v. State, 460 So.2d 207, 212, (Ala.Cr. App.1983), aff'd, 460 So.2d 216 (Ala. 1984).
"`"Although a robbery committed as a `mere afterthought' and unrelated to the murder will not sustain a conviction under  13A-5-40(a)(2) for the capital offense of murder-robbery, see Bufford v. State, [382 So.2d 1162 (Ala. Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980)]; O'Pry v. State, [642 S.W.2d 748 (Tex.Cr.App.1981)], the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Crim.App.1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. Cobern v. State, 273 Ala. [at] 550, 142 So.2d [at] 871 (1962). The defendant's intent to rob the victim can be inferred where `[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events.' Thomas v. State, 460 So.2d at 212.... See also Cobern v. State; Crowe v. State; Bufford v. State; Clements v. State.'"
"Bush v. State, 695 So.2d 70, 118-19 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), quoting Hallford v. State, 548 So.2d 526, 534-35 (Ala.Cr. App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989), quoting in turn Connolly v. State, 500 So.2d 57, 63 (Ala. Cr.App.1985), aff'd, 500 So.2d 68 (Ala. 1986)."
776 So.2d at 190-91. In Ex parte Roberts, 735 So.2d 1270 (Ala.1999), the Alabama Supreme Court specifically noted that "`[e]ven had the [defendant] killed the victim for some purpose unrelated to the theft, the taking of property from the victim after the murder constitutes robbery, as the murder and the subsequent taking of the property formed a continuous chain of events.'" 735 So.2d at 1277, quoting Johnson v. State, 479 So.2d 1377, 1380 (Ala.Crim.App.1985).
In this case, it is clear that the kidnapping, murder, and robbery formed a continuous chain of events that began in Francis's truck when Eggers beat Francis until she was unconscious and culminated in Eggers's fleeing the scene in Francis's truck after hiding Francis in the woods. Although the taking of the truck and its contents[8] may have occurred after Francis was already dead, it is clear that the murder and the taking formed a continuous chain of events. In addition, it is equally clear that Eggers kidnapped Francis when he drove her to the dirt road after he had rendered her unconscious and that Francis was still alive at this point in time. Therefore, there was ample evidence from which the jury could have concluded that Eggers *911 murdered Francis during the course of both a kidnapping and a robbery.

III.
Eggers contends that he was denied the effective assistance of trial counsel. Specifically, he argues that his trial counsel were ineffective because, he says, (1) they did not prepare for and properly present evidence of his mental state at the time of the crime; (2) they did not properly handle the motion to suppress his statements to police; (3) they did not object to the introduction of certain photographs into evidence; and (4) they did not object to the introduction of what he claims was evidence of prior collateral crimes. Eggers filed a motion for a new trial after his conviction and sentence; however, he did not include in that motion a claim of ineffective assistance of counsel. Although at the sentencing hearing before the trial court, Eggers expressed dissatisfaction with his attorneys for various reasons, he did not raise the specific allegations he now raises on appeal. Therefore, we review Eggers allegations of ineffective assistance of counsel under the plain-error rule. See Rule 45A, Ala.R.App.P.
"In order to prevail on an ineffective assistance of counsel claim, a defendant must meet the two-pronged test set out by Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
"`First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.'
"Id. at 687, 104 S.Ct. at 2064.
"`The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under "prevailing professional norms," was "reasonable considering all the circumstances.'" Daniels v. State, 650 So.2d 544, 552 (Ala.Cr.App.1994) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065). Once a defendant has identified the specific acts or omissions that allegedly were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall outside the wide range of professionally competent assistance. Id.
"When reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel's conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala.Cr. App.1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); Luke v. State, 484 So.2d 531 (Ala.Cr. App.1985).
"`Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances *912 of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'
"Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).
"And, even if an attorney's performance is determined to be deficient, the petitioner is not entitled to relief unless it is also established that `there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.
"In an ineffective assistance of counsel claim, the burden is on the claimant to show that his counsel's assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985)." McNair v. State, 706 So.2d 828, 839 (Ala. Crim.App.1997).

A.
Eggers contends that his trial counsel were ineffective for not requesting a psychological examination until after the trial began. Eggers maintains that trial counsel's failure to request a psychological examination before trial left counsel unprepared to present the defense that the kidnapping and robbery were mere afterthoughts because during voir dire, opening statements, and cross-examination of the State's witnesses counsel could not focus on his mental state. Eggers claims that, knowing that his psychological examination occurred over the weekend recess halfway through the trial, the jury did not "give any credibility to the psychological evidence `created' over the weekend." (Eggers's brief at p. 36.) According to Eggers, had trial counsel obtained the psychological evaluation before trial and properly prepared and presented that evidence to the jury, the jury would have found that the kidnapping and robbery were mere afterthoughts and would have found him guilty of intentional murder instead of capital murder.
The record reflects that, during the lunch recess on the fourth day of the trial proceedings, Thursday, August 22, 2002, Eggers's counsel requested that he be evaluated over the weekend to determine his mental state at the time of the crime.[9] *913 The trial court granted the request, and Eggers was evaluated over the weekend recess by Allen Shealy, a clinical and forensic psychologist. In response to that evaluation, the State had Eggers evaluated on Monday, August 26, 2002, after the trial had recessed for the day, by James F. Hooper, director of psychiatric services at Taylor Hardin Secure Medical Facility. The State rested its case-in-chief on Tuesday, August 27, 2002, and the defense presented the testimony of Dr. Shealy that day. The following day, the defense rested, and the State then presented the testimony of Dr. Hooper in rebuttal. During direct and cross-examination of both Dr. Shealy and Dr. Hooper, the jury was made aware that Dr. Shealy had evaluated Eggers over the weekend recess and that Dr. Hooper had evaluated Eggers Monday evening.
Eggers's argument is nothing more than bare allegations and speculation. Eggers does not identify what he believes his counsel could have said or done during voir dire, during opening statements, or during cross-examination of the State's witnesses had counsel had the psychological evaluation performed before trial that would have influenced the jury in any way. In addition, it is nothing but pure speculation on Eggers's part that the jury did not believe Dr. Shealy's testimony because his evaluation was performed during the trial,[10] but would have believed Dr. Shealy's testimony had the evaluation been done before trial. Therefore, Eggers failed to satisfy his burden of proof under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

B.
Eggers contends that his trial counsel were ineffective in their "handling of the motion to suppress." (Eggers's brief at p. 36.) Specifically, he argues that his counsel should have requested that the suppression hearing be held before the trial began, should have submitted their memorandum of law in support of the motion to suppress before the suppression hearing, and should have objected to the trial court's not allowing them to present an argument at the conclusion of the suppression hearing. According to Eggers, had counsel handled the motion to suppress properly, the trial court would have granted the motion and suppressed his statements to police, and the outcome of his trial would have been different.
The record reflects that Eggers's counsel filed the motion to suppress on May 20, 2002. On June 5, 2002, the trial court held a hearing on several of Eggers's pretrial motions. At the hearing, Eggers's counsel requested that the trial court conduct a full hearing on the motion to suppress, and the trial court indicated that it would do so, but at a later date. Counsel did not *914 object to the court's deferring the hearing on the suppression motion. Voir dire began on August 19, 2002, and the jury was struck on the afternoon of August 20, 2002. Immediately following the striking of the jury, the suppression hearing began, and it concluded the following morning on August 21, 2002, just before opening statements. As noted in Part I.C. of this opinion, at the conclusion of the hearing, Eggers's counsel submitted a memorandum of law in support of the motion to suppress and, although the State objected to the memorandum, it appears that the trial court accepted it. The trial court denied Eggers's counsel's request to make an argument at the conclusion of the hearing, and denied the motion to suppress, but indicated that it would read the memorandum of law.
Although Eggers alleges that his counsel should have requested that the suppression hearing be held before trial, he does not state any basis for making such a request, and he does not allege how the timing of the suppression hearing would have changed the trial court's ruling. Thus, Eggers failed to establish that his counsel were ineffective in this regard. As for Eggers's allegation that his counsel should have filed their memorandum of law in support of the motion to suppress before the suppression hearing instead of at the conclusion of the suppression hearing, as noted in Part I.C. of this opinion, the trial court's statements during the suppression hearing indicate that it accepted the memorandum and that it planned to read it; there is no indication that the trial court did not read the memorandum; and, having reviewed the memorandum, we conclude that the memorandum would not have changed the outcome of the suppression hearing. Thus, even if counsel should have filed the memorandum earlier, Eggers suffered no prejudice. Finally, contrary to Eggers's contention, the record reflects that his counsel did object to the trial court's not allowing them to make an argument at the conclusion of the suppression hearing; thus, counsel clearly were not ineffective in this regard.

C.
Eggers contends that his trial counsel were ineffective for not objecting to the introduction of certain photographs taken before and during Francis's autopsy, specifically, State's Exhibits 26, 44, 45, 46, 47, 48, and 50. Eggers argues that the photographs were prejudicial, that they had no probative value, and that they were offered solely to inflame the jurors. He maintains that had his counsel objected to the photographs, the trial court would not have allowed them into evidence and, as a result, the jury would not have found him guilty or would not have recommended the death sentence.
"Generally photographs are admissible into evidence in a criminal prosecution `if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.'" Bankhead v. State, 585 So.2d 97, 109 (Ala. Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala. Crim.App.1992), rev'd, 625 So.2d 1146 (Ala. 1993), quoting Magwood v. State, 494 So.2d 124, 141 (Ala.Crim.App.1985), aff'd, 494 So.2d 154 (Ala.1986), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). "Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome." Williams v. State, 506 So.2d 368, 371 (Ala.Crim.App.1986) (citations omitted). "[P]hotographic evidence, if relevant, *915 is admissible even if it has a tendency to inflame the minds of the jurors." Ex parte Siebert, 555 So.2d 780, 784 (Ala. 1989). "The fact that a photograph is gruesome and ghastly is no reason to exclude it from the evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph may tend to inflame the jury." Bankhead, 585 So.2d at 109-10.
"This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim's injuries." Ferguson v. State, 814 So.2d 925, 944 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). "`[A]utopsy photographs depicting the character and location of wounds on a victim's body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter.'" Jackson v. State, 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting Perkins v. State, 808 So.2d 1041 (Ala.Crim.App. 1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), on remand to, 851 So.2d 453 (Ala. 2002). "[A]utopsy photographs depicting the internal views of wounds are likewise admissible." Broadnax v. State, 825 So.2d 134, 159 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001). See also Dabbs v. State, 518 So.2d 825 (Ala.Crim.App.1987); Hamilton v. State, 492 So.2d 331 (Ala. Crim.App.1986); Fike v. State, 447 So.2d 850 (Ala.Crim.App.1983); and McKee v. State, 33 Ala.App. 171, 31 So.2d 656 (1947) (all holding that photographs of internal injuries were properly admitted although they were gruesome).
All of the photographs about which Eggers complains were introduced into evidence in the guilt phase of the trial during the testimony of Dr. Pustilnik. Dr. Pustilnik identified each photograph, detailed the injuries depicted in the photographs, and explained to the jury the significance of the injuries. We have carefully examined the photographs, as well as Dr. Pustilnik's testimony, and find that the photographs were relevant, probative, and properly admitted into evidence.
State's Exhibit 26 is a pre-autopsy photograph of the midsection of Francis's body taken from above the body while the body was on its back, and after Francis's clothing had been removed and she had been washed; the photograph shows her abdomen, her pubic area, her thighs, and her left hand. The photograph is one in a series of photographs taken from above the body that Dr. Pustilnik said are routinely taken before an autopsy begins.[11] Dr. Pustilnik testified that State's Exhibit 26 showed defensive wounds on Francis's left hand as well as an injury on the right side of her abdomen. Although the State also introduced into evidence a close-up photograph of the abdominal injury, State's Exhibit 32, the close-up did not show the location of the injury on the abdomen as did State's Exhibit 26. In addition, although other photographs depicting the defensive wounds on Francis's left hand were introduced by the State, the mere fact that a photograph is cumulative is not reason to exclude it. See, e.g., White v. State, 900 So.2d 1249, 1265 (Ala. Crim.App.2004) ("The fact that some of the photographs may have duplicated certain injuries would not have justified their exclusion from evidence."). State's Exhibit 26 was relevant and probative to the case as it showed the location of some of Francis's *916 injuries and was, thus, properly admitted into evidence.
State's Exhibits 44, 45, 46, 47, 48, and 50, are internal photographs of the wounds to Francis's head. State's Exhibits 44, 45, and 46 depict the top, the right side, and the left side, respectively, of Francis's skull, the scalp having been pulled back. Dr. Pustilnik testified that the photographs depicted extensive hemorrhaging, predominately on the right side of the skull, including hemorrhaging in the temporalis muscle on each side of the head, one of the muscles that helps to close the jaw. According to Dr. Pustilnik, the extent of the hemorrhaging indicated that Francis lived for several minutes after the head injuries were inflicted and that she was in severe pain from the injuries to the temporalis muscle. State's Exhibit 47 is a photograph of the top of the brain, the skull having been removed and, according to Dr. Pustilnik, showed hemorrhaging in the brain that indicated severe trauma. State's Exhibits 48 and 50 are photographs of the inside of the skull, after the brain had been removed; Dr. Pustilnik testified that the photographs showed compression fractures to the inside of the skull. Dr. Pustilnik said that compression fractures such as those seen in the photographs would not likely result from a hit from a fist, but rather, are indicative of someone "stomping" on the head, either with a foot or a hard object. (R. 797.) Contrary to Eggers's contention, these photographs were not offered into evidence solely to inflame the jury, but to show the nature and severity of the head injuries Francis sustained. Although certainly unpleasant, "[t]he mere fact that the photographs showing the nature and location of the victim's wounds were gruesome and cumulative [would] not [have] require[d] the trial court to exclude the photographs from evidence." Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). The photographs were relevant and probative to show the nature and extent of Francis's injuries, and they were properly admitted into evidence.
Because State's Exhibits 26, 44, 45, 46, 47, 48, and 50 were all properly admitted into evidence, any objection by Eggers's counsel would have been baseless. "[C]ounsel could not be ineffective for failing to raise a baseless objection." Bearden v. State, 825 So.2d 868, 872 (Ala.Crim. App.2001). Therefore, Eggers's trial counsel were not ineffective for not objecting to the introduction of these photographs.

D.
Finally, Eggers contends that his counsel were ineffective for allowing the introduction of evidence of collateral crimes under Rule 404(b), Ala.R.Crim.P. Specifically, he argues that his counsel should have objected to the evidence presented by the State indicating that Eggers was arrested in Kentucky while riding in a stolen pickup truck and for eliciting on cross-examination testimony that marijuana had been found in the pickup truck and that Eggers had been arrested for possession of marijuana, not for anything relating to the stolen pickup truck. Eggers maintains that the evidence introduced by the State was offered solely to show his bad character, was irrelevant to any issue in the case, and would "not have survived a timely objection." (Eggers's brief at p. 41.) He also argues that his counsel made matters worse by eliciting additional testimony on cross-examination regarding his arrest in Kentucky.
As noted previously, after Eggers murdered Francis, he fled to Kentucky, where he met Scott Mason. On January 1, 2001, Eggers and Mason went to New Albany, Indiana, to gamble; they made the trip in *917 a red Nissan pickup truck that Mason was driving and, during that trip, they obtained cash using Francis's debit card. During its case-in-chief, the State elicited testimony from Mason regarding the trip, including the fact that on their way back to Campbellsville, Kentucky, they were stopped by police and arrested. Mason testified that when the police initially attempted to stop them, Eggers said, "`I think I might have a warrant on me.'" (R. 572.) The State also elicited testimony from a deputy with the Nelson County, Kentucky, Sheriff's Department, Michael Watts, who stopped Eggers and Mason. During direct examination, Deputy Watts testified that when he initially attempted to stop the truck, the occupants of the truck attempted to drive away; that when the truck eventually stopped, the driver of the truck, Mason, attempted to get out of the truck and run, but that he stopped Mason from running; that he determined that the red Nissan pickup truck had been reported stolen; and that he then arrested both Eggers and Mason. On cross-examination, Eggers's counsel elicited testimony from Deputy Watts that when the truck was stopped, Eggers did not attempt to run or resist arrest and that Eggers identified himself and cooperated. Counsel also elicited testimony that during the course of the investigation, Deputy Watts determined that Eggers had no knowledge at the time of his arrest that the truck was stolen and that Eggers was never charged with theft or with receiving stolen property in relation to the truck; rather, Eggers's arrest was for misdemeanor possession of marijuana based on pieces of marijuana cigarette that were found in the ashtray of the truck. Upon further questioning by Eggers's counsel, Deputy Watts testified that Eggers had no marijuana or other illegal substance on his person when he was arrested, but that Mason did have marijuana on his person.
Rule 404(b), Ala.R.Evid., provides, in pertinent part:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...."
"The foregoing exclusionary rule does not work to exclude evidence of all crimes or acts, only such as are offered to show the defendant's bad character and conformity therewith on the occasion of the now-charged crime. If the defendant's commission of another crime or misdeed is relevant for some other material purpose in the case then it may be admitted." 1 Charles W. Gamble, McElroy's Alabama Evidence  69.01(1) (5th ed.1996) (footnotes omitted). "If the defendant's commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by a showing of bad character, then proof of such other act is admissible." Saffold v. State, 494 So.2d 164, 172 (Ala.Crim.App.1986). As the Alabama Supreme Court explained in Ex parte Clark, 728 So.2d 1126 (Ala.1998):
"`As a general rule, when a person is being tried for the alleged commission of one crime, evidence that he or she committed another illegal act that is not now charged is generally inadmissible. McLemore v. State, 562 So.2d 639 (Ala.Cr.App.1989); Gainer v. State, 553 So.2d 673 (Ala.Cr.App. 1989); C. Gamble, McElroy's Alabama Evidence  69.01(1) (4th ed.1991).'
"Ex parte Land, 678 So.2d 224, 243 (Ala. 1996). Notwithstanding that fact, the Court of Criminal Appeals has written:

*918 "`"We have recognized that the list of traditionally recognized exceptions is not exhaustive and fixed. See Nicks v. State, 521 So.2d [1018] at 1025 [(Ala.Cr.App.1987)]. `It must ever be borne in mind that the state may prove the accused's commission of another crime if such other crime is relevant for any purpose other than showing his guilt through the medium of bad character.' C. Gamble, McElroy's Alabama Evidence  69.01[1](1) (3d ed. 1977) ([McElroy's,] 2nd ed.)
"`"`In all instances, the question is whether the proposed evidence is primarily to prove the commission of another disconnected crime, or whether it is material to some issue in the case. If it is material and logically relevant to an issue in the case, whether to prove an element of the crime, or to controvert a material contention of defendant, it is not inadmissible because in making the proof the commission of an independent disconnected crime is an inseparable feature of it.'
"`"Snead v. State, 243 Ala. 23, 24, 8 So.2d 269, 270 (1942). However, even though evidence of collateral crimes or acts may be relevant to an issue other than the defendant's character, it should be excluded if `it would serve comparatively little or no purpose except to arouse passion, prejudice, or sympathy of the jury,' Spellman v. State, 473 So.2d 618, 621 (Ala.Cr.App.1985), or put another way, `unless its probative value is "substantially outweighed by its undue prejudice,"' United States v. Stubbins, 877 F.2d 42, 43 (11th Cir.), cert. denied, 493 U.S. 940, 110 S.Ct. 340 [107 L.Ed.2d 328] (1989) (quoting United States v. Beechum, 582 F.2d 898 (5th Cir. 1978) (en banc), cert. denied, 440 U.S. 920 [99 S.Ct. 1244, 59 L.Ed.2d 472] (1979))."
"`[Bradley v. State], 577 So.2d [541,] at 547-48 [(Ala.Cr.App.1990)]. In Alabama, evidence "is relevant if there is any logical relationship between it and the ultimate inference ... for which it is offered." C. Gamble, supra, at  69.91(1).'
"Guthrie v. State, 616 So.2d 914, 922 (Ala.Cr.App.1993)."
728 So.2d at 1133-34.
Contrary to Eggers's contention, the evidence relating to his arrest in Kentucky was not offered to show his bad character by establishing that he had committed another crime. Rather, the evidence appears to have had a dual purpose: to establish a link between Eggers and the red Nissan pickup truck because, as noted above, Francis's debit card was later found in that truck and to establish Eggers's flight after the murder and, thus, his consciousness of guilt. In order to link Eggers to the truck in which Francis's debit card was found, it was relevant and necessary to introduce evidence indicating that Eggers was in that truck at some point in time. Moreover, as this Court explained in Beaver v. State, 455 So.2d 253 (Ala. Crim.App.1984):
"`In a criminal prosecution the state may prove that the accused engaged in flight to avoid prosecution .... as tending to show the accused's consciousness of guilt. ... The state is generally given wide latitude or freedom in proving things that occurred during the accused's flight.' C. Gamble, McElroy's Alabama Evidence  190.01(1) (3rd ed.1977). `Evidence of flight is admissible even though it is weak or inconclusive or if several days have passed since the commission of the crime.' Tate v. *919 State, 346 So.2d 515, 520 (Ala.Cr.App. 1977). Evidence of flight is admissible even though that evidence involves the commission of other crimes by the accused. See Tate, supra; Neal v. State, 372 So.2d 1331, 1344-45 (Ala.Cr.App. 1979). For the same reason, evidence that the accused resisted or attempted to avoid arrest is admissible. Crenshaw v. State, 225 Ala. 346, 348, 142 So. 669 (1932)."
455 So.2d at 257. See also Rogers v. State, 630 So.2d 88 (Ala.1992) (holding that evidence that defendants had escaped from a work-release facility before crime, and that two months after the crime, the defendants, while traveling in stolen vehicle, led police on a high-speed chase while shooting at the police was admissible as evidence of flight and consciousness of guilt), and Brown v. State, 821 So.2d 219 (Ala. Crim.App.2000) (evidence of defendant's post-arrest escape from custody was properly admitted as evidence of flight and consciousness of guilt). Eggers's arrest was part and parcel of his flight and thus was properly admitted as evidence of his consciousness of guilt.
However, because the purpose of the evidence was to link Eggers to the red Nissan pickup truck and to establish Eggers's flight, the State did not present any testimony regarding the reason for, or disposition of, Eggers's arrest; the State merely elicited testimony from Deputy Watts that the red Nissan pickup truck was stolen, that Mason attempted to avoid the stop, and that both Eggers and Mason were arrested. Based on the evidence presented by the State, the jury could have inferred that Eggers was involved in the theft of the truck or that he had some knowledge that the truck was stolen and had been arrested for either theft or receiving stolen property, and that, although Mason was the driver of the truck, Mason and Eggers attempted to avoid the stop because Eggers knew that he was wanted in connection with Francis's murder. To lessen the blow of this evidence, Eggers's counsel established, through cross-examination of Deputy Watts, that Eggers was not involved in any way with the theft of the truck and that he had no knowledge that the truck was stolen, and that Eggers was not arrested for anything related to the truck, but for possession of marijuana found in the truck. Counsel then sought to raise the inference that the marijuana in the truck most likely belonged to Mason based on the fact that Mason had marijuana on his person when he was arrested, while Eggers did not, and that, based on Eggers's cooperation with the police, the attempt to evade the traffic stop was not an attempt by Eggers to flee, but was solely Mason's decision.
Given that the evidence of Eggers's arrest in Kentucky was admissible and the fact that the State's evidence in this regard left open many questions regarding Eggers's involvement, we cannot say that counsel's attempt to explain the arrest and lessen its impact was not sound trial strategy. Therefore, we conclude that Eggers's trial counsel were not ineffective in this regard.

IV.
Eggers contends that his death sentence violates the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because, he says, in his case, it was the trial court, not the jury, who made the factual findings relating to aggravating circumstances necessary for imposition of the death penalty.
The two aggravating circumstances found to exist by the trial court were that the murder was committed while Eggers was engaged in the commission of a kidnapping *920 and a robbery. See  13A-5-49(4), Ala.Code 1975. Both of these aggravating circumstances were proven beyond a reasonable doubt by virtue of the jury's guilt-phase verdicts finding Eggers guilty of capital murder during a kidnapping and capital murder during a robbery. See Ex parte Hodges, 856 So.2d 936 (Ala. 2003), and Ex parte Waldrop, 859 So.2d 1181 (Ala.2002). Contrary to Eggers's contention, it was the jury, not the trial court, that "determined the existence of the `aggravating circumstance necessary for imposition of the death penalty.'" Ex parte Waldrop, 859 So.2d at 1188, quoting Ring, 536 U.S. at 609, 122 S.Ct. 2428. Because the jury, by virtue of its guilt-phase verdicts, found the existence of two aggravating circumstances, both of which exposed Eggers "to a range of punishment that had as its maximum the death penalty," Ex parte Waldrop, 859 So.2d at 1188, there was no violation of Ring.

V.
In accordance with Rule 45A, Ala.R.App.P., we have examined the record for any plain error with respect to Eggers's capital-murder convictions, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings during the guilt phase of the trial.
We have also reviewed Eggers's sentence in accordance with  13A-5-53, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving Eggers's capital-murder convictions, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Eggers of the capital offenses charged in the indictment, a separate sentencing hearing was held before the jury in accordance with  13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning the aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended a sentence of death by a vote of 11-1.
Thereafter, the trial court held another hearing, in accordance with  13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Eggers to life imprisonment without parole or to death as recommended by the jury. The trial court ordered and received a written presentence investigation report, as required by  13A-5-47(b). In its sentencing order, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in  13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated *921 in  13A-5-51, Ala.Code 1975, and any mitigating circumstance found to exist under  13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense and Eggers's participation in it.
In its findings, the trial court found the existence of two statutory aggravating circumstances: (1) that the murder was committed during the course of a kidnapping, see  13A-5-49(4), Ala.Code 1975, and (2) that the murder was committed during the course of a robbery, see  13A-5-49(4), Ala.Code 1975. The trial court found the existence of one statutory mitigating circumstance: that Eggers had no significant history of prior criminal activity, see  13A-5-51(1), Ala.Code 1975. The trial court also heard testimony regarding Eggers's character and record and any of the circumstances of the offense that Eggers offered as a basis for sentencing him to life imprisonment without parole instead of death, see  13A-5-52, Ala.Code 1975. In this regard, the trial court found as a nonstatutory mitigating circumstance that Eggers was remorseful for the crime.
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the mitigating circumstances, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Eggers to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence, and we find no plain error or defect in the penalty phase of the proceedings.
Eggers was convicted of murder committed during the course of a kidnapping and a robbery. These offenses are defined by statute as capital offenses. See  13A-5-40(a)(1) and (a)(2), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., cases dealing with murders committed during a kidnapping: Lewis v. State, 889 So.2d 623 (Ala.Crim. App.2003); Ziegler v. State, 886 So.2d 127 (Ala.Crim.App.2003); Smith v. State, 838 So.2d 413 (Ala.Crim.App.2002); Smith v. State, 797 So.2d 503 (Ala.Crim.App.2000); Broadnax v. State, 825 So.2d 134 (Ala. Crim.App.2000), aff'd, 825 So.2d 233 (Ala. 2001); Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), on remand to, 851 So.2d 453 (Ala. 2002); Duncan v. State, 827 So.2d 838 (Ala.Crim.App.1999), aff'd, 827 So.2d 861 (Ala.2001); Loggins v. State, 771 So.2d 1070 (Ala.Crim.App.1999), aff'd, 771 So.2d 1093 (Ala.2000); Trawick v. State, 698 So.2d 151 (Ala.Crim.App.1995), aff'd, 698 So.2d 162 (Ala.1997); and cases dealing with murders committed during a robbery: Hocker v. State, 840 So.2d 197 (Ala.Crim. App.2002); Hodges v. State, 856 So.2d 875 (Ala.Crim.App.2001), aff'd, 856 So.2d 936 (Ala.2003); Reeves v. State, 807 So.2d 18 (Ala.Crim.App.2000); Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001); Hardy v. State, 804 So.2d 247 (Ala.Crim.App. 1999), aff'd, 804 So.2d 298 (Ala.2000); West v. State, 793 So.2d 870 (Ala.Crim.App. 2000); Jackson v. State, 791 So.2d 979 (Ala.Crim.App.2000); and Clemons v. State, 720 So.2d 961 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998).
After carefully reviewing the record of the guilt phase and of the penalty phase of Eggers's trial, we find no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. The findings and conclusions of the trial court are amply supported by the evidence. We have independently *922 weighed the aggravating circumstances against the mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstances outweigh the mitigating circumstances, and we agree that death is the appropriate sentence in this case. Considering the crime committed and Eggers, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Eggers's convictions and his sentence of death are affirmed.
OPINION OF OCTOBER 1, 2004, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.
NOTES
[1] Eggers said that when he hit Francis "blood just ... went everywhere" and that there was blood all over the cab of the truck as a result of the attack. (C. 409.)
[2] Mason testified that Eggers gave him a debit card with the name "Francis Murray" on it, along with the personal identification number necessary to use the card, and asked him to get the money from the automatic teller machine. According to Mason, when he asked about the name on the card, Eggers said that the card belonged to one of his relatives who had given it to him to help him out. The State introduced into evidence bank records indicating that a withdrawal was made from Francis's account at an automatic teller machine located in New Albany, Indiana, on January 1, 2001.
[3] At that time, law enforcement had no idea what had happened to Francis; they knew only that Francis and her truck were missing.
[4] See, e.g., State v. Cleator, 71 Wash.App. 217, 857 P.2d 306 (1993) (no legitimate expectation of privacy in tent wrongfully erected on public land), and Standridge v. State, 37 Ark. App. 153, 826 S.W.2d 303, rev'd on other grounds, 310 Ark. 408, 837 S.W.2d 447 (1992) (trespasser on public land has no legitimate expectation of privacy in tent).
[5] Rather, Eggers's argument merely assumes that the tent would be protected under the Fourth Amendment.
[6] In addition, we decline to remand this case for further proceedings on the motion to suppress because to do so "would unduly enlarge the scope of the plain error review as authorized by our appellate rules." Ex parte McNair, 653 So.2d 353, 360 (Ala. 1994).
[7] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[8] The indictment charged Eggers not only with taking Francis's truck, but also with taking Francis's purse, Francis's debit card, and cash that were in the truck.
[9] We note that, at a pretrial hearing on June 5, 2002, over two months before the trial began on August 19, 2002, Eggers's counsel requested that Eggers be evaluated. The trial court granted counsel's oral request and ordered what the court termed a "preliminary" evaluation by the Department of Mental Health and Mental Retardation in Walker County. (R. 65.) The court then indicated that if the results of the preliminary evaluation suggested that a more comprehensive evaluation at the Taylor Hardin Secure Medical Facility was necessary, it would then order the further evaluation. Neither counsel nor the court indicated at that time whether the evaluation was to determine Eggers's competency to stand trial and/or to determine Eggers's mental state at the time of the crime, and the record does not indicate whether a preliminary evaluation was ever performed, or, if so, what the results were. However, it appears from counsel's assertions later during the trial that the purpose of this preliminary evaluation was to determine Eggers's competency to stand trial, not to determine his mental state at the time of the crime.
[10] Based on the facts, the jury could have believed Dr. Shealy's testimony and still found Eggers guilty of capital murder. Although Dr. Shealy testified that Eggers's initial attack on Francis in the truck was the product of uncontrollable rage, he said that that rage episode ended when Francis became unconscious, and that Eggers's actions after that ÔÇö driving Francis to a secluded dirt road, kicking and strangling Francis to make sure she was dead, dragging Francis into the woods where she could not be seen from the road, and taking Francis's truck ÔÇö were not the product of uncontrollable rage. As noted in Part II of this opinion, if the underlying felonies and the murder were part of a continuous chain of events, the murder is a capital one. The jury could have believed Dr. Shealy's testimony that the initial attack was the product of uncontrollable rage and still found that the kidnapping, robbery, and murder were part of one continuous chain of events.
[11] State's Exhibits 25, 27, and 28, about which Eggers does not complain, are the companion photographs from the same angle. State's Exhibit 25 shows Francis's head and chest; State's Exhibit 27 shows her lower right leg and foot; and State's Exhibit 28 shows her lower left leg and foot.